**UNITED STATE DISTRICT COURT**
**DISTRICT OF NEVADA (LAS VEGAS)**

Jacqueline Wegner
Estate of Ronile Russell (deceased)


       Plaintiffs,                              **COMPLAINT**

       v.

Wells Fargo Bank, National Association
101 North Phillips Avenue
One Wachovia Center
Sioux Falls, SD 57104

c/o Corporation Service Company - Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

And the following Wells Fargo Former Officers

       Carrie Tolstedt
       John Stumpf
       Pamela Conboy
       Claudia Russ Anderson
       Matthew Raphaelson
       James M. Strother

       Defendants.                   **JURY TRIAL DEMANDED**
_____

## I.    INTRODUCTION AND BACKGROUND

This is a case sounding primarily in civil RICO. Precisely, this matter involves racketeering by a group of Wells Fargo officers (prior to their separation from employment) associated in fact and intent upon utilizing numerous predicate acts to infiltrate the parent, Wells Fargo & Company, and create and perpetuate an illicit enterprise in violation of law and causing deliberate injury to Plaintiffs and countless others. The primary culpable malfeasants conducted their illicit activities under the umbrella of the Wells Fargo Bank, National Association, also named as a defendant here.

Set forth below – and further described in the attached RICO Case Statement (incorporated herein by reference) and its Exhibits "A" and "B" containing myriad admissions and concessions by Wells Fargo officials – are Plaintiffs' claims against individuals associated in fact, and otherwise, for purposes of infiltrating and utilizing one of the world's largest banks, Wells Fargo & Company, for nefarious purposes.   The Enterprise (as it shall be referenced throughout, in order to distinguish it from legitimate other "enterprises"), was composed primarily of associated individuals named here, including within its former Community Bank leadership that oversaw, furthered, and otherwise managed operations of the illicit enterprise.  This is not to say that the larger Wells Fargo & Company can remain blameless, for its parent and headquarters personnel enabled The Enterprise association in pertinent part – until the scandal surrounding The Enterprise became publicly known.  And so while The (RICO) Enterprise was encompassed and inextricably intertwined within its highly-troubled National Association Community Banking department, there is certainly no assurance that, once the storm clouds pass, Wells Fargo will not simply reconstitute The Enterprise in some other stealth form – and fleece (or even destroy) vulnerable populations as they have done here.

Wells Fargo & Company is constituted as a Delaware corporation - with numerous other offices and/or branches under, among others, defendant Wells Fargo Bank, National Association ("National Association" or "NA") (approximately 6200 in number) either within or outside of the State of Delaware, with its principal place of business at 420 Montgomery Street in the city and county of San Francisco, State of California.  Plaintiffs name National Association, and various of its culpable associated personnel, who both formed and metastasized a cancer within Wells Fargo, and enabled that cancer to spread and prosper.  Collectively, defendants have for (and within) the relevant 10-year period abused an entity for illegal purposes – as exemplified by

their corrupt and distinct manipulation of the "community banking" functions with the illicit intent of furthering their personal financial gain at all costs – notwithstanding the injuries to property and, as here, even the death – of vulnerable persons.  Although as noted much evidence is being withheld by the Defendants and will only be made available upon full and vigorous discovery, much uncontroverted evidence upon which the immediate action is founded has been conceded by Wells Fargo – either in sworn testimony before the United States Congress (Exhibit "A" to attached RICO Case Statement), or within a highly-revealing and recent Wells Fargo Board of Director's Report ("Board Report" or "Independent Directors of Wells Fargo & Company Sales Practices Investigation Report" or simply "the Report") in April of 2017 (Exhibit "B" to attached RICO Case Statement).  Relevant portions of both are cited herein, consistent with the attached RICO Case Statement narrative, and as noted are incorporated by reference.  It is also requested that this honorable court take judicial notice of the admissions and concessions of the most senior Wells Fargo Officer (Exhibit "A" to RICO Case Statement) and of its Board of Directors (Exhibit "B" to RICO Case Statement).

Plaintiffs assert claims, *inter alia*, for violations of 18 USC sections 1962(a) through (d). Plaintiffs allege that the defendants violated 18 USC 1962 by conducting or participating in the conduct of an enterprises' affairs through a pattern of racketeering involving mail and wire fraud, in addition to bank fraud, among other predicate acts alleged herein.  Plaintiffs further allege that each of the individual defendants violated 18 USC 1962(d) by conspiring to violate other provisions of 18 USC 1962 set forth below.  Each of the individual defendants is a former officer of Wells Fargo and among the culpable persons comprising The Enterprise within Wells Fargo - separate and distinct from the enterprise(s) that Wells Fargo & Company may legitimately manage and operates).  Each defendant, as conceded, conducted the affairs of the *illicit*

*enterprise* – within the vehicle of the Wells Fargo NA Community Bank - not merely its *own* affairs.  The defendants destroyed the lives of many with the malevolence of The Enterprise, to be certain.  Each of the individual defendants has been separated from Wells Fargo, but The Enterprise may remain (within the structure of the National Association Community Banking division, or otherwise) and thus the likelihood of recurrence of illicit activity is decidedly plausible when the vacillating media relegates the Enterprise scandal to its back burner.  It remains incumbent upon Article III courts – who are not driven by the ruminations of the media cycle – to excise The Enterprise and to help assure that the cancer within Wells Fargo enters remission.

The alleged knowingly unlawful conduct of the defendants (both within the National Association and, in particular, within their Community Banking division) in support of The Enterprise involves, *inter alia*, fraudulently enticing vulnerable (often elderly) citizens, among others, to open multiple (and unnecessary) accounts in order to drive extremely unscrupulous sales targets.  As seemingly and openly acknowledged by Wells Fargo, *see e.g*., Exhibits A and B to the attached RICO Case Statement, this was a plainly established pattern of illicit activities (as is noted throughout, recently conceded by Wells Fargo in these reports of its own internal investigation and in sworn testimony before the United States Congress) in which ill-gotten gains from long-term, organized activity were invested back into The Enterprise through its culpable leadership (and their enabling supervisory personnel) who controlled the racketeering activity.  Illicit and exceedingly unethical (at best) sales targets, and the illegal tactics employed to drive such targets, were fully intended to defraud susceptible persons and were, at all times relevant known, *inter alia,* as pithy revenue drivers such as the "eight is great" policy (among other attractive names intended to defraud vulnerable customers to open useless multiple accounts),

and such "policies" and practices in part constitute the foundation of The Enterprise and wrongdoing by all of the defendants.  In the case of Plaintiff Ronile Russell, the illicit enterprise and ruthless bank tactics allegedly resulted in her death, while the insatiable greed of Enterprise participants resulted in Plaintiff Jacqueline Wegner (the only child of Plaintiff Ronile Russell) languishing in jail due exclusively to the defamatory *per se* falsehoods of Wells Fargo personnel carrying out the above patterns and practices of The Enterprise – who were, as conceded within Exhibits A and B referenced earlier, threatened by Enterprise leadership with termination if the monies fraudulently misappropriated by The Enterprise were to be returned, *e.g*., to the accounts of Plaintiff Ronile Russell at her previous financial institution.

A key objective of the conspiracy, and a crucial element of The Enterprise itself, was to misrepresent the (non)importance of holding multiple accounts at Wells Fargo, and to illicitly encourage vulnerable persons to transfer substantial amounts of money - often their life savings - into these accounts from other financial institutions.  This happened to Plaintiff Ronile Russell, and it destroyed her.  Enterprise personnel were adversely and intentionally "incentivized" by defendants to mislead Wells Fargo customers, *e.g*., by insisting upon those customers opening "special" checking accounts that offered no particular financial advantage or "special" feature. So, for example, while Plaintiff Ronile Russell didn't need any Wells Fargo account (she just happened to live close to a Wells Fargo branch, or "store", in Henderson, Nevada, contiguous to Las Vegas), she was instructed by branch personnel to open several accounts, and transfer her *life savings* into that particular National Association "store".  The branch personnel were driven by unethical quotas, and *defrauded other banks and their own customers*.  Terrified at loss of employment in the bank and industry, they would go to any length never to relinquish any account – no matter the extent (if any) of its illicit initial opening at Wells Fargo.  Although not

required for purposes of RICO plausibility analysis, there was an organized, profit-seeking motive attached to acts of the illicit enterprise.  This was an immense fraud machine based in illicit monetary gain.

The Enterprise resulted in known and actual financial penalties and termination of employment for Wells Fargo personnel not as adept at using fraudulent tactics to drive the "eight is great" and related sales targets.  Defendant Carrie Tolstedt, an Enterprise leader, instilled the "fear of God" into each and every retail bank employee, and their very employment status revolved around the illegal predicate acts undertaken daily.  The Enterprise was relentless, and their wrongdoing often led to *hourly* meetings to review their unethical "sales targets".  This in turn "motivated" the Wells Fargo "store" employees to commit fraud as part of their everyday job responsibilities, including the fraud leading cruelly to the death of Plaintiff Ronile Russell (although not set forth in this complaint as a separate count, driving Russell to her death exemplifies the malicious tactics of The Enterprise).  The "at any cost" mentality of The Enterprise also led to the proximate mental breakdown and similar suffering of her daughter, Plaintiff Jacqueline Wegner, who was separated from her mother and seemingly faced imminent jail time.  As a result of Enterprise practices, Wegner was driven to the verge of suicide; further, Wenger lost business and property which is clearly compensable in this Circuit under *Diaz*, *see* footnote 1, *infra*.

The alleged unlawful conduct also involves a conspiracy between the defendants to unduly pressure bank personnel to "cross-sell" Wells Fargo products to new and existing customers at a rate of 2-3 times (conservatively) greater than the industry average.  These sales quotas were so perverse that bank personnel, instructed by The Enterprise to "run it like they own it" and fearing for their jobs and motivated by illicit monetary incentives, even resorted to identity theft and

bank fraud when other illegal sales tactics failed.  The bank personnel targeted elderly and less sophisticated customers, hoping the fraud would go unnoticed.  These unscrupulous sales targets that defrauded vulnerable persons were, commensurate with the "eight is great" scam and similar subterfuge, accompanied an attempt at even higher targets, *e.g.*, the "Jump in with 10", "Fly into February" and March into March" illicit enterprise activities.  Further, the defendants unjustifiably pressured "store" managers to dishonestly retain account deposits at all costs as they provided The Enterprise with a source of "stable, low-cost funding" and were considered a "growth engine".  In the case of Plaintiff Russell, as noted, the illicit enterprise and ruthless and intentional bank practices in furtherance thereof proximately resulted in fraudulent conversion of her property (and likely, her death), while the Wells Fargo illicit greed resulted in Plaintiff Jacqueline Wegner being wrongly imprisoned and prevented from tending to her mother's day-to-day needs  - reprehensible conduct carried out by the intentional misrepresentations of Wells Fargo personnel who did not want the money that had been fraudulently misappropriated by The Enterprise returned to Russell's previous financial institution.  This was misappropriation of Russell's life savings, accompanied by The Enterprise lying to law enforcement in order to prevent Wegner from intervening and returning such life savings to where it/they had resided for decades.  As a result of Enterprise lies to law enforcement, Wegner was imprisoned, see Count V herein, and anticipated taking her own life.  This was too much for Russell to take, and The Enterprise got that which they foreseeably sought – both her money and her life.

Due to its breadth and depth, the Wells Fargo National Association Enterprise is the most cruel and substantial form of illicit enterprise – meant to defraud and debase elderly, vulnerable persons who had worked their entire lives only to have The Enterprise deceive and swindle them. What occurred here was unmitigated malevolence.

In the process, defendants have created and overseen a vast illicit enterprise predicated in mail, wire and bank fraud – among numerous other forms of equally egregious predicate acts underlying a pattern of racketeering targeting tens of thousands of victims.  In so doing, defendants have committed numerous crimes and defamed (*per se),* defrauded and otherwise injured Plaintiffs in order to carry out the objectives of The Enterprise.  Few will be surprised if Enterprise participants serve hard time – least of all the Enterprise culpable persons.

This civil RICO cause of action – combined with claims of defamation *per se* under California law – seeks $50,000,000 on behalf of Jacqueline Wegner, for herself and on behalf of the estate of her late mother, Ronile Russell.  This complaint lays bare but a few of the known illicit activities of The Enterprise, but there are many more awaiting discovery.  When all is said and done, many others destroyed by Wells Fargo NA will join in testifying against the Defendants and the damage done by The Enterprise.  Their ill-gotten gains must be forfeited, and their reprehensible conduct addressed, in the form of treble damages for the harm that the enterprise infiltrating this financial institution has caused those who trusted them.

At bottom, this lawsuit revolves around an unethical and uncaring group of Wells Fargo defendants – call them the "braintrust" of The Enterprise (and their enablers, particularly the enabling lawyer James Strother and CEO John Stumpf).  Wells Fargo - reputed to be among the largest financial institutions in the world – was inattentive to the massive greed (as long as The Enterprise returned illicit profits allowing reinvestment and thus an Enterprise in perpetuity) and thus allowed it to be placed, in importance, above the lives and well-being of vulnerable (senior) citizens such as Plaintiff Ronile Russell.  Wells Fargo enablers cruelly allowed a cancer to invade its National Association community banking function.  According to publicly-available investigative reports and congressional testimony under oath by one or more Defendants, the

"eight is great" enterprise, among other intentionally illicit schemes, also victimized numerous other vulnerable persons.  Enterprise participants intended to obtain and subsequently reaped tens of millions in salary, bonuses, incentive pay and benefits due to illicit tactics such as the "eight is great" enterprise and the corresponding (in part) "strong cross-sell ratios" of financial products.  Their fraudulent actions, perpetrated against those far less able and certainly less fortunate, were also intended to further empower reinvestment in The Enterprise by fraudulently inducing susceptible persons to convert investment instruments into several different Wells Fargo accounts <u>without any need to do so</u>.  This exploitation of the weak and elderly is unconscionable, as often the accounts at issue were entire retirement (life) savings transferred from other financial institutions to Wells Fargo by the Wells Fargo NA artifice.  And just to be clear, The Enterprise returned converted profits to Carrie Tolstedt and others in amounts that literally shock the conscience (before seeking to claw them back and then *only when the media and oversight entities took notice*) – and kept The Enterprise flush and thriving through further reinvestment of ill-gotten gains.  Upon information and belief, the United States Department of Justice and other criminal enforcement entities are currently investigating the actions of Defendants for the very predicate acts and racketeering alleged and described throughout this Complaint.  All those integral to The Enterprise have significant exposure, and no less than the President of the United States and a primary Democrat rival (Senator Elizabeth Warren of Massachusetts) have both strongly intimated that the Wells Fargo community banking function – whom all know was synonymous and in sync with The Enterprise – should be pared from the remainder of Wells Fargo and the bank should be "broken up."  Many of these significant advocates of punishing The Enterprise will certainly have more to say as this lawsuit progresses.

## II.     JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§1332, and 18 U.S.C. §1964, and supplemental jurisdiction over this case pursuant to 28 U.S.C.

§1367.

2.      Plaintiffs have standing to bring this action because they have been directly

affected and victimized by the unlawful conduct complained of herein.  Their injuries are

proximately related to the illegal conduct of defendants.

3.      Venue is proper pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391(b)(2), (3) in

that Defendants either conduct significant business here or reside here and are subject to personal

jurisdiction in this District.

## III.    PARTIES

4.      Each of the foregoing paragraphs is hereby incorporated as if fully set forth

herein.  The term "person" noted herein has been interpreted liberally to include natural persons.

### Plaintiffs

5.      Plaintiff Ronile Russell (deceased) ("Russell" or "Ronile Russell") was an elderly

resident of Nevada.  She was defrauded and abused by Wells Fargo personnel in Henderson

(Clark County, Nevada, near Las Vegas), who were carrying out the policies and practices of

The Enterprise.  These personnel misled Russell, and defrauded her, in order to meet their illicit

enterprise quotas and objectives.  These persons, in order to retain these quotas and objectives,

also defamed Russell's only child (resulting in her being improperly imprisoned) and were

plausibly the reason for Russell's death.  Russell was a person holding a legal and beneficial

interest in property, *e.g*., her estate and its various accounts, who suffered a concrete injury as a

direct and proximate cause in that but for the conduct constituting the various violations of law,

upon which she detrimentally relied in light of the Defendants' deceit, Russell would not have

been injured therein.  Such injury was foreseeable, without intervening causes, and with direct causal connection between violation and injury.

6.      Plaintiff Jacqueline Wegner ("Wegner") is the only child of Plaintiff Ronile Russell, and is the executor of the Ronile Russell estate.  Wegner was the victim, as set forth herein, of the vicious enterprise tactics and foreseeable outcomes – watching her mother die a painful death as a result of Enterprise actions following her (Wegner) being wrongfully jailed. Wegner was a person holding a legal and beneficial interest in property, *e.g*., her employment, employment opportunities, a family home that had to be sold in order to pay legal fees to battle her wrongful imprisonment, her mother's estate and its various accounts, who suffered a concrete injury as a direct and proximate cause in that but for the conduct constituting the various violations of law Wegner would not have been injured therein.  Such injury was ultimately foreseeable, without intervening causes, and with direct causal connection between violation and injury.

## Defendants

7.      Defendant John Stumpf ("Stumpf"), was during all periods relevant to this matter the Chairman and Chief Executive Officer of Wells Fargo & Company, and retired (effective October 12, 2016) under pressure for his role in furthering and enabling the "eight is great" and related National Association enterprise activity.  Stumpf gave sworn testimony before the United States Senate and House of Representatives, RICO Case Statement, Exhibit A, and also was interviewed for the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report (the Report), *see* RICO Case Statement, Exhibit B, in which he conceded material facts underlying the plausibility of the allegations in this Complaint.

8.  Pamela Conboy ("Conboy"), Arizona's Regional Banking leader from 2007 until 2017, as reported by Wells Fargo in the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report (the Report), *see* RICO Case Statement, Exhibit B, pp. 25-26, drove Arizona from last place to first place in Community Bank regional sales performance stack rankings within two years of taking her position.  According to the Report, *see* RICO Case Statement, Exhibit B, multiple witnesses stated that Conboy applied "intense sales pressure", such as a very heavy emphasis upon rankings and sales performance.  This immense pressure manifested itself through multiple daily calls to discuss sales results and regular "rally" days that extended the "Jump into January" campaign throughout the year, *i.e*., Fly into February; March into March; etc… .  Multiple witnesses also said that Conboy or certain of her subordinates encouraged bankers to sell customers "duplicate accounts" ***regardless of actual customer need***. One manager reporting to Conboy lamented that Arizona district managers "taught branch managers how to sell same day multiple account opens to customers with ***false customer needs***"; another reported that "some Managers and Bankers felt uncomfortable opening multiple DDA's (Demand Deposit Accounts) [sic] on the same day for a customer" because "it feels as though they are manipulating the sales system."  As conceded by Wells Fargo, Conboy also told subordinates that they should not overemphasize quality accounts, but should manage to the Community Bank's minimum quality standard in order not to miss productive sales opportunities.  Conboy stated to one district manager that "your team should be managing within the 87.5% [Rolling Funding Rate] guideline at a store level . . . You and I have discussed the opportunity costs of 100% funded accounts . . . my direction would be to coach your stores and MPs to remain above the combined 87.5% [Rolling Funding Rate] . . . ."  According to the Report, ***<u>Tolstedt held Conboy up as a model for success</u>***.  For example, Conboy was asked to

make a presentation at a leadership conference in 2010 during which she discussed Arizona's practices, including in particular the use of daily "morning huddles" to discuss the previous day's sales reports and encouragement of district managers to call and check on branches multiple times per day.  According to the Report, witnesses also said that ***regional leaders were sent to study Conboy's leadership techniques and Conboy traveled to teach them to other regions***.  For her illicit Enterprise activity, Conboy was terminated for cause on February 21, 2017.

   9. Claudia Russ Anderson ("Russ Anderson"), formerly the Group Risk Officer for the Community Bank (and thus a key participant in The Enterprise), as noted in the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report, see Exhibit B of the attached RICO Case Statement, pp. 49-51, led the first line of defense for risk in the Community Bank, a particularly significant role in light of the decentralized nature of the risk function at Wells Fargo during her tenure as Group Risk Officer.  As conceded by Wells Fargo, Russ Anderson's performance fell far short of what was expected and required of the senior risk officer in the Community Bank.  Russ Anderson failed to adequately assess and advocate for changes in the business practices that resulted in sales integrity violations. She also did not adequately address customer harm arising from improper sales practices.  As further conceded, Russ Anderson exhibited a lack of transparency and failed to escalate sales integrity issues and related terminations to Wells Fargo's Board of Directors.  Multiple witnesses, including senior officers of Wells Fargo, reported that Russ Anderson was similarly not forthcoming or candid in her communications with them, a view supported by email communications evidence.  Instead, *witnesses stated that* ***Russ Anderson was "running interference" for Tolstedt (and The Enterprise)*** and filtering communications with other Wells Fargo control officers.  Russ Anderson minimized and obscured issues (and otherwise obstructed) in reporting on the

Community Bank, including sales practices. From late 2011, Russ Anderson challenged

language in the Corporate Security portions of the reports to the A&E (Audit & Examination)

Committee.  In one email exchange in 2012, Michael Bacon, the head of Corporate Security

(responsible for Internal Investigations), stated that Russ Anderson "often challenge[d] the Audit

and CS A&E reporting verbiage".  Bacon noted that "our data continues to highlight a

concerning trend in the area of Sales Integrity – [including] "increases in *confirmed fraud*, thus,

we need to continue to escalate this issue with senior leadership."  Russ Anderson told him that

his reporting made the problem sound "so much worse than it is."  One witness called Russ

Anderson an advocate, rather than independent and objective, when dealing with regulators on

sales practice issues. When personnel in Corporate Risk expressed the view that a draft

presentation to the ERMC (Enterprise Risk Management Committee) by the Community Bank

about sales practices did not provide information about the "current state," Russ Anderson wrote

to another Community Bank leader, "I am worried about putting something like that into a deck.

I'd rather we did that verbally because this deck is subject to the regulators [sic] review." As

described at page 105 of the Report, *see* Exhibit B of the attached RICO Case Statement, Russ

Anderson challenged Internal Investigations' data on the number of employee terminations

related to sales integrity, with the result that the information was omitted from a report to the full

Risk Committee.  Russ Anderson – as a key player in The Enterprise – moved inappropriately

slowly to address sales practice issues. The head of Wells Fargo Corporate Security was

frustrated with Russ Anderson when she (Russ Anderson) took over the SSCOT (Sales and

Service Conduct Oversight Team) in 2011/2012 as he thought she would be more proactive in

investigating sales integrity issues.  For these Enterprise activities, Russ Anderson was

terminated for cause on February 21, 2017.

10.     As noted on pp. 48-49 of the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report, *see* Exhibit B of the attached RICO Case Statement, Matthew Raphaelson ("Raphaelson") was the Wells Fargo official (and Enterprise participant) ultimately responsible for regional bank sales goals and supervising the sales incentive program, subject to defendant Tolstedt's approval.  He was described as Tolstedt's "right hand".  As Tolstedt's capo, and despite being a senior leader of the Community Bank, Raphaelson did not view it as his job to police sales integrity violations.  According to the Report, Raphaelson was aware that excessive sales goals and pressures led to employee misconduct, and was often confronted with objections to his goals and numbers-driven system.  Multiple witnesses stated that Raphaelson received repeated complaints that his sales goals were too high, were too focused on the number of products sold *and led to bad behavior*, such as the opening of unauthorized accounts ***and the sale of unnecessary products to customers***.  Raphaelson had received information demonstrating that certain locations were responsible for high numbers of unfunded accounts and accounts funded for only short periods of time - indicia of potential inappropriate behavior, including simulated funding.  Even when told that the goals he established were leading to bad behavior, *Raphaelson was unwilling to adequately address sales goals **or incentives to sell unnecessary products to customers** because doing so might result in fewer sales of high quality accounts*; he was willing to tolerate poor quality accounts rather than change the sales model.  In his interview, Raphaelson disclaimed knowledge of high levels of sales integrity-related terminations, but as noted on page 33 of Exhibit B to the attached RICO Case Statement, emails show that he was aware at least by November 2013 of approximately 1,000 sales integrity-related terminations per year and believed that to be a favorable number. Raphaelson was terminated for cause on February 21, 2017 for Enterprise activities.

11.     Defendant James M. Strother is the former Senior Executive Vice President, General Counsel, for Wells Fargo & Company.  He is a member of the California Bar, and defendant Strother's California Bar Number is, upon information and belief, 219462.  Despite his ethical obligation to the California Bar, Strother, upon information and belief, also directly enabled the extraordinary fraud and related continuing racketeering activity of The Enterprise.

12.     Defendant Carrie Tolstedt was during all periods relevant to this matter Senior Executive Vice President, Community Banking, in which role she oversaw the Wells Fargo branch banks (known as "stores") and was responsible for its business with 40 million retail-banking customers.  Tolstedt led the illicit enterprise to "cross-sell" multiple financial products to individual customers including but not limited to Plaintiffs.  Sales goals connected with cross-selling, which were integral to the illicit enterprise at issue, also were included within her corporate responsibilities.  Tolstedt was summarily terminated for her Enterprise wrongdoing.

## IV.     FACTUAL ALLEGATIONS

13.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth herein.  Initially, there are certain necessary elements that are common to all RICO violations that are hereby alleged as follows in all RICO aspects of this Complaint.  These include (a) the culpable person defendants, simply stated as "entities capable of holding a legal or beneficial interest in property", listed above and alleged to be culpable herein; (b) The Enterprise, which as herein alleged and satisfied are "any individuals, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Courts in this judicial district (and everywhere else) have interpreted the term "enterprise" very broadly; (c) the alleged interstate commerce requirement is obviously satisfied, as both the activities of The Enterprise and the predicate acts of racketeering affect interstate commerce (wrongdoing occurred in virtually every state in the nation); (d) the "pattern of racketeering" in

16

this case involves tens (if not hundreds) of thousands of acts of racketeering activity within the past ten years – this case is also unique in that it allegedly involves both open-ended (with *dire threat of continuity, as noted herein*) and close-ended schemes; (e) "racketeering activity" as alleged throughout, with particular federal offenses also enumerated in 18 U.S.C. §1961 alleged here; (f) the injuries described herein are alleged to have derived, (i) as to 18 U.S.C. §1962(c), from the predicate acts; (ii) as to 18 U.S.C. §1962(a), from the investment of racketeering income;  (iii) as to 18 U.S.C. §1962(b), from the acquisition of an interest or control over The Enterprise; and (iv) as to 18 U.S.C. §1962(d), from the multitude of overt acts committed in furtherance of the conspiracy.  Although Plaintiffs allege they were injured by numerous predicate acts in furtherance of the racketeering scheme, they need only have been injured by a single predicate act committed in furtherance of the scheme in order to recover.  Also, commonplace throughout all allegations is the concrete financial loss to Plaintiffs when they were deprived of their ability to use or transfer their property, *i.e.*, their bank accounts, the loss of Wegner's home, etc…, by the defendants.  As noted, Wegner was forced to sell her home to fight the utterly false slurs of The Enterprise personnel carrying out Carrie Tolstedt's illicit policies and practices as a core aspect of the illegal enterprise.

14.     18 U.S.C. §1962(a):  Section 1962(a) of RICO, which applies to the conduct of all defendants, provides that "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which such person has participated as a principal within the meaning of §2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."  Plaintiffs were injured, *inter alia*, by

substantial investment of racketeering income by the defendants – each of whom received illicit income derived from a pattern of racketeering.

15.     Defendants are culpable persons who received inordinate income from their participation as principals in a conspiracy with overt acts in concert, evidencing an extensive pattern of racketeering activity.  The underlying predicate acts were related by having the same or similar purposes, results, participants, victims, methods of commission, *etc*… - and continuous – with both a close-ended scheme consisting of a series of related acts extending over a substantial period of time, and an open-ended component with the threat of continuity through the duration of the alleged misconduct or the threat of continuing criminal conduct.

16.     Income by this group of defendants associated in fact, and otherwise, and affecting individual monetary business interests, was used to finance future racketeering activity.

17.     18 U.S.C. §1962(b):  Section 1962(b) of RICO, which applies to the conduct of all defendants, provides that it "shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.  Plaintiffs were injured, *inter alia*, by the acquisition of an interest or control over The Enterprise.

18.     18 U.S.C. §1962(c): Section 1962(c) of RICO, which applies to the conduct of all defendants, provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"  The defendants are culpable persons and form the foundation for The Enterprise.  While Tolstedt was the primary wrongdoer of each and every aspect of the

racketeering conduct, each defendant individually engaged in a pattern of racketeering through their fraudulent conduct – as well as and in addition to their collective activities as members of The Enterprise.

19.     18 U.S.C. §1962(d):  Section 1962(d) of RICO, which applies to the conduct of all defendants, makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Plaintiffs were injured, *inter alia*, by numerous overt predicate acts of racketeering in furtherance of the conspiracy.

20.     By the acts alleged herein, defendants jointly and severally have aided and abetted and conspired to violate the numerous laws described here.

21.     The law presumes that a person intends the obvious results of their actions.

22.     Defendants may (and likely will) be charged and convicted of multiple, related violations of law which form a pattern and which violations are each punishable by more than one year in jail.  Most such felonies are punishable – either individually or in the aggregate – with between five and fifty years in prison under applicable guidelines.  The statute of limitations for such crimes has many years yet to run.  A corporation's scienter may be established by the collective knowledge of the corporate entity's employees, as well as (individually or collectively) with the admissions set forth in Exhibits A and B to the attached RICO Case Statement.

### The RICO Enterprise:  Predicate Acts and Progeny

#### *Anticipatory Obstruction of Justice*

23.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth herein.

24.     18 U.S.C. §1519 states, in relevant part, that "whoever knowingly … conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the … proper administration of any matter within the jurisdiction of any department or agency of the United States … or in relation to the contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

25.     Multiple federal agencies, notably the United States Comptroller of the Currency, the United States Department of the Treasury, the United States Department of Justice, among others, have jurisdiction over retail banking fraud and The Enterprise, and upon information and belief is/are investigating defendants.

26.     Upon information and belief, defendants have directed Wells Fargo employees such as those at the Henderson, Nevada branch to hide, destroy or otherwise make unavailable financial instruments and documents in order to further the objectives of The Enterprise – and improperly retain customer deposits to stoke the "growth engine" with "stable, low-cost funding" much like the Henderson, Nevada personnel illicitly did by seizing and claiming to have destroyed Plaintiff's check #1280 – as noted in the RICO Case Statement Chronology – in an attempt to deny Plaintiff Russell access to her life savings.

27.     The Justice Department prosecutorial manual advises that section 1519 makes prosecution much easier because it covers "any matters" or applies "in relation to or contemplation of" any matters."  Further, and as related directly to the conduct of The Enterprise and particularly but not exclusively in relation to the Henderson, Nevada Wells Fargo Enterprise personnel, "[n]o corrupt persuasion is required."

### Criminal Conspiracy to Defraud United States

28.     18 U.S.C. §371 provides in relevant part "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."  This criminal provision applies unambiguously to The Enterprise.

### Criminal Violation of Federal Mail Fraud Statute, 18 U.S.C. §1341

29.     It appears inevitable that the Defendants will be charged with criminal violation of the federal mail fraud statute under 18 U.S.C. § 1341, which provides in relevant part "[w]however, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises … for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail … any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  In brief, each defendant participated in a scheme based on an intent to defraud, and used the mails to further that scheme.  This constitutes actual fraudulent conduct, carried out in myriad ways with respect to the property of Plaintiffs (*as well as* the right to honest services for which Defendants may also be prosecuted).

30.     Defendants devised or intended to devise a scheme or artifice meant to defraud and/or obtain money or property from elderly, vulnerable populations.

31.     Defendants utilized false or fraudulent pretenses, representations, and/or promises in order to defraud and/or obtain money or property from these vulnerable persons, intending to defraud and with intent to obtain or cause the loss of money or property by means of materially false or fraudulent pretenses or representations.

32.     In order to achieve or attempt to achieve the fraud described in the preceding paragraphs, defendants sent correspondence and other documents that were sent or delivered by the Postal Service and by wire.  The accompanying RICO Case Statement, incorporated by reference, also provides ample particularity of the fraud described hereto as well as numerous concessions and admissions in its Exhibits A and B.

33.     Violation of 18 U.S.C. § 1341 is a felony punishable by 20 years (per count) of imprisonment and fines as noted above.

34.     Upon information and belief, Wells Fargo NA and the individual defendants are responsible (conservatively) for hundreds of thousands of counts of mail fraud, as the mailings need not be fraudulent in and of themselves; they are RICO predicates as long as they further a fraudulent scheme.

### Criminal Violation of Federal Wire Fraud Statute, 18 U.S.C. §1343

35.     It appears inevitable that the Defendants will be charged with criminal violation of the federal wire fraud statute under 18 U.S.C. § 1343, which provides in relevant part "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

36.     Defendants devised or intended to devise a scheme or artifice meant to defraud and/or obtain money or property from vulnerable (often elderly) populations, through use of interstate wires.

37.     Defendants utilized false or fraudulent pretenses, representations, and/or promises in order to defraud and/or obtain money or property from these vulnerable persons, intending to defraud and with intent to obtain or cause the loss of money or property by means of materially false or fraudulent pretenses or representations.

38.     Defendants transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice when they transmitted telephone and cellular telephone calls, documents, facsimiles, emails, instant messages, and any other form of communication.

39.     Violation of 18 U.S.C. § 1343 is a felony punishable by 20 years (per count) of imprisonment and fines as noted above.  Similar to fraud involving the "mails", each Defendant participated in a scheme based on an intent to defraud, and used the "wires" to further that scheme.  This constitutes actual fraudulent conduct, carried out in myriad ways with respect to the property of Plaintiffs.

40.     Upon information and belief, Wells Fargo is responsible (conservatively) for hundreds of thousands counts of wire fraud as the communications need not be fraudulent in and of themselves; they are RICO predicates as long as they further a fraudulent scheme.

### *Criminal Acts of False Statements*

41.     Defendants will likely be charged with multiple, related violations of law which form a pattern and practice constituting false statements to officials of the United States Government in violation of 18 U.S.C. §1001 which in relevant part provides "… whoever, in any manner within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully -  (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years….".

42.     Defendants made numerous reports to federal government agencies claiming to be in compliance with various laws and regulations; such statements also constitute bank fraud as set forth herein.  Defendants have also, upon information and belief, made numerous false statements in covering up The Enterprise wrongdoing before federal executive and legislative branch investigators and auditors.  Upon information and belief, said false statements (conservatively) number in the thousands.

43.     For each count of the making of such false statements, Defendants will prospectively be fined and sentenced to a significant term of years and fines concomitant therewith.

### *Laundering of Monetary Instruments in Violation of 18 U.S.C. §1956(a)(1)*

44.     It is clear, both directly and circumstantially, that defendants knew that the property involved in Enterprise financial transactions was the proceeds of both state and federal felonies.

45. Each of the defendants, as part of The Enterprise, participated in initiating or concluding a financial transaction within the definitional context of the relevant money laundering statutes.

46. Conceded in the attached testimony before Congress, and reinforced by the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report and in other ways readily apparent, is that the defendants as part of The Enterprise intended to promote the carrying on of specified unlawful activity under 18 U.S.C. §1956(a)(1)(A)(i).

47. Defendants will if convicted be fined the greater of twice the value of the property involved in the enterprise transaction or $500,000, and be imprisoned for up to 20 years, or both. While not necessary as predicate, civil forfeiture will also apply.

### *Transport and Receipt of Money in Violation of 18 U.S.C. §2314*

48. Having formed their Enterprise, defendants, and in particular Tolstedt, devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises from vulnerable persons who trusted Wells Fargo and the Wells Fargo brand, and The Enterprise thereby caused their ill-gotten gains procured by such fraud to be transported in interstate commerce.

49. Defendants will as appropriate be fined under Title 18 and imprisoned for up to 10 years per count.

50. Upon information and belief, defendants could be charged with (hundreds of) thousands of counts, resulting in significant fines, jail time, and forfeiture as appropriate.

### *Financial Institution Fraud in Violation of 18 U.S.C. §1344*

51. The Enterprise knowingly executed a scheme to defraud their own lenders and creditors by means of false or fraudulent pretenses, representations, or promises.

52.     On each occasion that such a scheme was carried out as part of The Enterprise, defendants (and perhaps Wells Fargo & Company) became liable for a $1,000,000.00 fine and a 30-year prison sentence (or both).

53.     Upon information and belief, financial institutions rely upon other financial institutions for their everyday course of business, and must make representations based upon, as relevant in the case of defendants, the fraudulent Enterprise set forth herein.

54.     Defendants, and unfortunately Wells Fargo & Company, face not only significant fines and criminal sentences, but also forfeiture and loss of certification in the United States, as a direct and proximate result of the pattern of continuous racketeering activity and illicit conduct of The Enterprise.

**The RICO Enterprise:  Pattern of Racketeering Activity and Continuity of Conduct**

55.     18 U.S.C. §1964(c) defines "racketeering activity" as "(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code:  Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section

1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to

financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section

1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426

(relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the

sale of naturalization of citizenship papers), sections 1461-1465 (relating to obscene matter),

section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal

investigations), section 1511 (relating to the obstruction of State or local law enforcement),

section 1512 (relating to tampering with a witness, victim, or an informant), section 1513

(relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false

statement in application and use of passport), section 1543 (relating to forgery or false use of

passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and

misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery,

and trafficking in persons), section 1951 (relating to interference with commerce, robbery, or

extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate

transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund

payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956

(relating to the laundering of monetary instruments), section 1957 (relating to engaging in

monetary transactions in property derived from specified unlawful activity), section 1958

(relating to use of interstate commerce facilities in the commission of murder-for-hire), section

1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252 and 2260 (relating to

sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of

stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen

property), various provisions of section 2318 – 2421 (relating to infringement and trafficking in

goods and services), sections  175-78 (relating to biological weapons), section 831 (relating to

nuclear materials); (C) [regarding indictable offenses relating to payments to labor organizations

and embezzlement from union funds]; (D) [relating to fraud under Title 11 and fraud in the sale

of securities, et al]; (E) [acts indictable under the Currency and Foreign Transactions Reporting

Act]; (F) [acts indictable under the Immigration and Nationality Act]; (G) [acts indictable under

2332b(g)(5)(B); [citations omitted].

56.     Congress specifically chose to describe the pattern of racketeering in RICO in

terms of *what it is not* – that is less than two racketeering acts – instead of *what it is*.  Under no

circumstances would any rationale human being – including Defendant Stumpf under oath and

the Wells Fargo Board Report based upon a lengthy and sophisticated internal investigation by

Shearman and Sterling LLP – allege that the myriad acts by Defendants amount to fewer than

two, but Plaintiffs nonetheless allege that the numbers of acts alleged herein *straightforwardly

and obviously* meet and exceed the "pattern of racketeering activity" requirement.

57.     Plaintiffs also allege myriad illegitimate schemes as part of the immense and

enduring continuity and relatedness of The Enterprise – each of which is founded in numerous

racketeering acts.  But for purposes of recovery here, these multiple schemes can be analyzed as

a single overarching unlawful scheme and unitary enterprise.  Both the RICO statute and its

legislative history unambiguously establish this, and the United States Supreme Court does not

differ.  The Enterprise was an extraordinary display of the very wrongdoing which Congress

intended to protect against, and which Courts have incessantly recognized, and which defendant

Stumpf (in his testimony before Congress) and the Independent Directors of Wells Fargo &

Company Sales Practices Investigation Report have openly and notoriously acknowledged.

## V.       CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a
Pattern of Racketeering Activity)
18 U.S.C. §§1961(5), 1962(b)
Against All Defendants
"Count I Defendants"**

58.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth

herein.  Because §§1962(a) and (b) do not deal with the notion of conducting a separate

enterprise, this Circuit has concluded that the person/enterprise distinction does not apply to

violations of these sections, which powerfully imbues to the benefit of Plaintiffs here.

59.     Within and during the past ten calendar years – the relevant period encapsulating

both the relevant unlawful enterprise conduct, the wrongdoing against Plaintiffs, and the date of

this Complaint - all defendants did cooperate jointly and severally in the commission of two or

more of the RICO predicate acts set forth at 18 U.S.C. §§1961(1)(A) and (B), and did so in

violation of RICO as set forth at 18 U.S.C. §1962(b).

60.     Defendants operate as an enterprise within the meaning of RICO, the activities of

which effect interstate (and foreign) commerce.

61.     Defendants not only invested ill-gotten gains obtained by and through The

Enterprise, but also enriched themselves in amounts that few human beings could ever envision.

By virtue of the predicate acts described herein, including, *inter alia*, laundering of monetary

instruments, engaging in monetary transactions improperly derived from unlawful activity, and

the like, Defendants transferred, received, furthered and supplied financing and income that was

derived, both directly and indirectly, from a pattern of racketeering activity in which each of

them participated as a principal and used and invested, both directly and indirectly, such income

and the proceeds of such income, in establishing, operating and furthering their illegal Enterprise in violation of 18 U.S.C. §1962(a).

62.     As a direct and proximate result of Defendants' violation of 18 U.S.C. §1962, Plaintiffs suffered the loss of property, honest financial services and support, and suffered significant other business and pecuniary damages.  In the end, Plaintiff Ronile Russell also lost her life and Plaintiff Jacqueline Wegner suffered a mental breakdown and continuous suicidal ideations deriving from her own injury to property and exacerbated by the health reversals (and eventual death) of her mother while Wegner was improperly imprisoned as a direct result of Defendants' defamation *per se*.[1]  As noted in the accompanying RICO Case Statement, Enterprise participants in Henderson, Nevada (Joanna Mariano, and Zivana Kovacevich, among others) first knowingly misled Russell into opening useless accounts and transferring her life savings to Wells Fargo, then *lied to police* in order to prevent Plaintiffs – upon discovering the deception of The Enterprise – from returning the life savings to accounts outside of Wells Fargo. The lies to police (another series of offenses by The Enterprise) set in motion events which resulted in the arrest and detention of Wegner and the death of Russell, and the concomitant damage noted herein.

63.     Plaintiffs further allege that all defendants committed two or more of the offenses itemized above, knowingly and intentionally, in a premeditated manner to protect the continuity of their respective racketeering activities.

64.     Plaintiffs demand that judgment be entered against defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c),

---

[1] Plaintiff Wegner also lost business and property as a result of her personal injuries, and the Ninth Circuit has considered favorably *en banc* in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005), that a plaintiff's loss of employment and employment opportunities *due to false imprisonment* is an injury to "business or property" within the meaning of RICO.  The court rejected the notion that business or property interests harmed by a defendant's acts must actually be the target of the predicate act.

compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-

interest, costs, and an award that this Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity:  18 U.S.C. §§ 1961(5), 1962(c)
### Against All Defendants
### "Count II Defendants"

65.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth

herein.

66.     All defendants did associate with a RICO enterprise of individuals who were

associated in fact, among other things, and who engaged in, and whose activities did affect,

interstate and foreign commerce.  Defendants are bad actors who misused and invested in what

might otherwise constitute legitimate business means, in a structured fashion and sharing

purpose, with continuity of such structure distinct from that inherent in the pattern of

racketeering – although in this Circuit there is no requirement of structure separate from the

conspiracy to commit racketeering aside from, as here: a purpose, relationships among those

associated with the enterprise, and longevity sufficient to allow those associates to pursue the

enterprise's purpose.

67.     Similarly, all Defendants did conduct and/or participate, either directly or

indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering

activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).  The extraordinary greed

and patent illegality – despite Wells Fargo headquarters General Counsel Strother being clearly

culpable as the enabler (along with defendant Stumpf) – of driving Enterprise illicit revenue

through fraudulently instructing vulnerable persons to set up accounts or have fake accounts set

up in their name is, again, numerous and appalling to the conscience.  These multiple related acts

constitute, *inter alia*, the racketeering activity that forms the basis of these RICO claims – and have (i) seemingly been conceded under oath by defendant Stumpf, (ii) been significantly reinforced by the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report, and (iii) attributed to the leadership of Tolstedt – as they constitute a pattern of racketeering activity.

68.     Plaintiffs further allege that all defendants committed two or more of the offenses itemized above, knowingly and intentionally, in a premeditated manner to protect the continuity of their respective racketeering activities.  Plaintiffs also allege that Stumpf and the Wells Fargo Board of Directors have conceded under oath and/or penalty of false statement those facts which establish that defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above and herein, in violation of 18 U.S.C. §1962(c).

69.     Within and during the past ten calendar years – the relevant period encapsulating both the relevant unlawful enterprise conduct, the wrongdoing against Plaintiffs, and the date of this Complaint – all Defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts set forth at 18 U.S.C. §§1961(1)(A) and (B), and did so in violation of RICO as set forth at 18 U.S.C. §1962.  Defendants Strother and Stumpf (as the enablers) and Tolstedt (as the principal wrongdoer) created, sustained and preserved racketeering practices presumably numbering in the hundreds of thousands – and destroyed the lives of Plaintiffs and others – just to create and defend a potentially endless and immeasurable Enterprise.

70.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), Plaintiffs have been injured in their property.  Plaintiffs

demand that judgment be entered against Defendants, jointly and severally, including an award

of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages,

reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this

Court deems just and proper.

**THIRD CAUSE OF ACTION**
**(18 U.S.C. § 1962(a))**
**Against All Defendants**
**"Count III Defendants"**

71.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth

herein.

72.     As noted throughout, The Enterprise is engaged in, and its activities affect,

interstate commerce.

73.     In concert with the concessions under oath by defendant Stumpf, and the

revelations contained in the Independent Directors of Wells Fargo & Company Sales Practices

Investigation Report, attached herewith to the RICO Case Statement (Exhibits A and B), the

Defendants used and invested income that was derived from a pattern of racketeering activity in

an interstate enterprise.

74.     Attendant to but separate from injuries stemming from the conduct of The

Enterprise through a pattern of racketeering, Plaintiffs have incurred further albeit distinct injury

to their property from Defendants' investment of racketeering income in Wells Fargo "stores"

such as the "store" in Henderson, Nevada.  Enterprise personnel such as Joanna Mariano and

Zivana Kovacevich felt not only emboldened (by bonuses, etc…), but believed that their

employment depended upon not allowing Russell's and Wegner's property to leave Wells Fargo.

Enterprise personnel would go to any length (and did so, commensurate with the racketeering

practices of The Enterprise), including lying to police (in itself a crime) and irrespective of whether their customers were injured in their property (or even died) as a consequence.

75.     As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. §1962(a), Plaintiffs have been injured in their property.  Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**(Conspiracy to Engage in a Pattern of Racketeering Activity:  18 U.S.C. §§ 1961(5), 1962(d))**
**Against All Defendants**
**"Count IV Defendants"**

76.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth herein

77.     All defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§1962(b) and (d), and, as set forth herein, defendants agreed and conspired more broadly to violate 18 U.S.C. §§1962(a)-(c).

78.     Within and during the past ten calendar years – the relevant period encapsulating both the relevant unlawful enterprise conduct, the wrongdoing against Plaintiffs, and the date of this Complaint - defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts set forth at 18 U.S.C. §§1961(1)(A) and (B), and did so in violation of RICO as set forth at 18 U.S.C. §1962(d).

79.     Plaintiffs further allege (and Wells Fargo appears to concede) that all defendants committed two or more of the offenses itemized above, knowingly and intentionally, in a

premeditated manner to protect the continuity of their respective racketeering activities, also in violation of 18 U.S.C. §1962.

80.     Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above; that conduct as noted and alleged constitutes a conspiracy to violate 18 U.S.C. §§(a), (b) and (c), in violation of 18 U.S.C. §1962(d).

81.     Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (Defamation *Per Se* Pursuant to California Law)
### Against All Defendants
### "Count V Defendants"

82.     Each of the foregoing paragraphs is hereby incorporated as if fully set forth herein.

83.     Upon information and belief, a core aspect of The Enterprise was to intimidate anyone requesting (or even suggesting) that an account be moved from any Wells Fargo "store" – even if, as here, that account had been acquired fraudulently and otherwise illegally through the actions and instructions of Enterprise personnel and other culpable persons.

84.     Upon information and belief, The Enterprise – with personnel primarily working for the Wells Fargo National Association situated in Sioux Falls, South Dakota but with enabling participants situated in Wells Fargo corporate headquarters/principal place of business in San Francisco, California – instructed (or threatened) Wells Fargo personnel to use any measure, legal or illegal, to obtain and retain accounts.  This policy was one of the key illicit strategic underpinnings of The Enterprise.

85.     Defamation *per se* under California law (Wells Fargo corporate headquarters and its principal place of business is in San Francisco) is an invasion of the interest in reputation … involving the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damages.  It is also a weapon of The Enterprise.

86.     In order to enforce the policy strategy of The Enterprise, Wells Fargo personnel accused Wegner of being a criminal felon.  The result of this defamation *per se* was the completely improper imprisonment of Wegner, leading to the destruction of her reputation, the loss of her home and the death of her mother (who was influenced by such defamation *per se* – involving lying to law enforcement – that her only child was attempting to "abuse" Russell). These malicious defamatory tactics were directly attributable to The Enterprise, and something that Enterprise personnel attempted to constantly reinforce.

87.     Libel and/or slander under California law which is defamatory of the plaintiff without the necessity of explanatory matter – ***such as accusing one of a crime which leads to false arrest and improper imprisonment*** – is libel or slander on its face.  Such slurs so readily cause harm that damages are presumed without additional proof.

88.     According to the Restatement (Second) of Torts, §570, one who publishes matter defamatory to another in such a manner as to make the publication a libel or slander is subject to liability to the other although no special harm results if the publication imputes to the other a criminal offense.

89.     California Civil Code §§45, 46 (West) demands that California take an expansive view of libel and slander *per se*, but such an expansive view is not even necessary here.  In order to carry out The Enterprise scheme, Wells Fargo falsely accused Wegner of the *crime* (a felony, at that) of abusing her mother, resulting in Wegner's imprisonment.  This is black letter, long-standing California law recognizing *per se* liability for the false charge of a criminal act.  *See also* California Civil Jury Instructions, Verdict Form 1704.

90.     Actual damages are without question in this case, as the wrongful death of Russell, loss of Wegner's home and other property, and destruction of Wegner's reputation caused by the Enterprise defamation have resulted in Wegner being driven to the brink of insanity and suicide.  The same is true regarding emotional damages, as the Enterprise defamation tactic – one of many – which was particularly reckless and malicious, makes an award of punitive damages entirely necessary and appropriate.

91.     It is only within the past few months – as noted in the congressional hearing transcripts included with the attached RICO Case Statement and more recently with the admissions and concessions of Wells Fargo itself in the Independent Directors of Wells Fargo & Company Sales Practices Investigation Report (RICO Case Statement, Exhibits A and B) – *that The Enterprise tactics **even became known***.  Due to the concealment of these enterprise tactics, the statute of limitations for the malicious defamation *per se* of defendants (in particular, the malfeasance of California-based former General Counsel James Strother) has been tolled by

reason of all defendant's fraudulent concealment.  Defendants, through their affirmative misrepresentations and omissions, actively concealed these illegal strategies and tactics from Plaintiffs (and everyone else, other than the Enterprise participants).  Plaintiffs were unaware and could not reasonably know or have learned through reasonable diligence of the vicious and vile Enterprise tactics of defendants.

92.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count I Defendants as follows: Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

93.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count II Defendants as follows:  Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

94.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count III Defendants as follows: Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C. §1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs, and an award that this Court deems just and proper.

95.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count IV Defendants as follows: Plaintiffs demand that judgment be entered against Defendants, jointly and severally, including an award of trebled damages as consistent with 18 U.S.C.

§1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest,

post-interest, costs, and an award that this Court deems just and proper.

96.　　**WHEREFORE**, Plaintiff requests that this Court enter judgment against the

Count V Defendants as follows: $10,000,000.00, as well as an additional award of punitive

damages, compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest,

post-interest, costs, and an award that this Court deems just and proper.

97.　　**WHEREFORE**, Plaintiff requests that this Court take any cognizable action in

equity deemed just and proper to prevent The Enterprise from being reconstituted, and Wells

Fargo from reinvesting illegitimate income derived from racketeering activity into said illicit

enterprise.

98.　　Plaintiff demands trial by jury on all claims and issues so triable.


**DATED**: May 18, 2017　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　/s/  Mark R. Heilbrun
　　　　　　　　　　　　　　　　　Mark Ramsey Heilbrun
　　　　　　　　　　　　　　　　　Harlan Bradley LLP
　　　　　　　　　　　　　　　　　D.C. Bar No. 434681 *(**Nevada Petition Pending**)*
　　　　　　　　　　　　　　　　　Reagan International Trade Center
　　　　　　　　　　　　　　　　　1300 Pennsylvania Avenue, N.W.
　　　　　　　　　　　　　　　　　Suite 190, # 414
　　　　　　　　　　　　　　　　　Washington, D.C. 20004
　　　　　　　　　　　　　　　　　mh@harlanbradleyllp.com
　　　　　　　　　　　　　　　　　(202) 997-1609

　　　　　　　　　　　　　　　　　*Counsel of Record*

　　　　　　　　　　　　　　　　　/s/ Shelley Krohn
　　　　　　　　　　　　　　　　　Shelley Krohn
　　　　　　　　　　　　　　　　　Shelley D. Krohn, Ltd.
　　　　　　　　　　　　　　　　　510 South 8th Street
　　　　　　　　　　　　　　　　　Las Vegas, NV 89101
　　　　　　　　　　　　　　　　　shelley@krohnlawoffice.com
　　　　　　　　　　　　　　　　　(702) 421-2210

　　　　　　　　　　　　　　　　　*Associate Resident Counsel*